| | |
|---|---|
| **CARLTON L. RASOR,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )  **Cause No. 2:16-cv-47-WTL-MJD** |
| | ) |
| **INDIANA STEEL FABRICATING, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ENTRY ON PENDING MOTIONS

This cause is before the Court on several motions filed by Defendant Teamsters Local Union No. 716 ("Union") and Defendant Indiana Steel Fabricating, Inc. ("Indiana Steel"). The motions are fully briefed and the Court, being duly advised, rules as follows.

## I. MOTIONS FOR SANCTIONS AND RELATED MOTIONS

Each Defendant has filed a motion for sanctions seeking dismissal of this case with prejudice and an award of fees and costs. *See* Dkt. Nos. 72 and 74. The Court denied Indiana Steel's previous motion to dismiss for failure to prosecute, but did so "without prejudice, in that the Defendant may reassert the arguments set forth in the motion in any new motion to dismiss for failure to prosecute in the event that the Plaintiff does not fully cooperate in the future." Dkt. No. 54. The Defendants assert that the Plaintiff's failure to cooperate has continued, making dismissal appropriate at this time. Indiana Steel also has filed a motion entitled Motion for Leave to File Supplemental Reply in Support of Its Second Motion to Dismiss (Dkt. No. 92). That motion is **granted**, and the Court has considered all of the parties' filings related to that motion in making this ruling.

The instant motions were prompted by the Plaintiff's failure to appear at a settlement conference before the Magistrate Judge on October 23, 2017. The Plaintiff did, in fact, appear, but he was over an hour late, and (not surprisingly) the Magistrate Judge had excused everyone else before he arrived. There is nothing to suggest the Plaintiff's failure to appear on time at the settlement conference was motivated by a desire to inconvenience the Defendants or the Magistrate Judge; it appears to have been caused by an unfortunate set of circumstances. Whether some or all of those circumstances were within the Plaintiff's control, and whether lesser sanctions might be appropriate, is an issue the Court will leave to the Magistrate Judge to decide, inasmuch as the conference was before him and he has issued an order to show cause with regard to the issue. However, the Court finds that the Defendants have not demonstrated that the ultimate sanction of dismissal with prejudice is warranted.

In addition to the Plaintiff's failure to appear on time for the settlement conference, Indiana Steel points to what it characterizes as additional failures to cooperate in discovery since the Court's denial of the motions to dismiss as support for its motion for sanctions. Specifically, Indiana Steel points to the following deposition testimony by the Plaintiff as demonstrating that he failed to comply with his discovery obligations:

> Q:   When did the Teamsters tell you that you didn't have insurance?
> A:   . . . I would have to refer to my notes before I was 100 percent accurate, but I would say it was no longer than a month, maybe two.
> Q:   What notes are you talking about?
> A:   Well, you know, just notes that I would have in a notebook that I would, you know, I would feel that would be important to this case, you know, I might would jot down stuff that I—so I wouldn't remember—so I wouldn't forget so I could come and talk to my lawyer about it.
> Q:   Okay. Have you produced any of these notes in discovery?
> A:   No, because I just really kind of just started kind of keeping these notes because my original notebook was left at Indiana Steel and I was not able to go back and recover my personal property. So when I ended up getting Mr. Frey, then, through my investigation from the Internet and watching tutorials about what I should be doing—this is my lawyer—at that point,

> then I start trying to keep, you know, little notes that what—in case I might
> have forgot to tell Mr. Frey something I would, you know, jot it down and
> if I was at home and just happened to remember it, like, you know, this
> would be something that my lawyer needs to know.
>
> Q:    So this is information that you've shared with your lawyer.
>
> A:    Actually, no, I haven't gave my lawyer my notebook yet because I don't—
> I would not—I would think that there's still information coming in that I
> would need to put in the those notes, but, I mean, I guess I can provide him
> with, you know, pages out of that, but I would like to continue to keep some
> form of a timeline on certain events in this case. So then in—you know in
> the future, then I could give them to my lawyer.
>
> Q:    Have you told your lawyer that you're keeping this timeline?
>
> A:    Yes, I have.
>
> Q:    Okay.
>
> A:    But I would say I only told my lawyer about this timeline maybe about a
> week and a half ago.
>
> Q:    Okay. And when did you start keeping it?
>
> A:    Maybe about March of this year. Well, I—I had problems with my first
> attorney. So my first attorney just wasn't doing me how I felt that she
> should have been doing me. So since it had been so long since I, you know,
> talked to my lawyer about it, or talked to anyone, really, within detail about
> it, I just started kind of jotting down stuff . . . [s]o I would remember it so I
> wouldn't forget when I went to go interview for new lawyers. . . .
>
> Q:    . . . You started keeping this timeline or notes before—during the period
> that you were not represented by a lawyer.
>
> A:    Right.

Dkt. No. 75-1 at 5. During the course of his deposition, the Plaintiff also testified that "I want to
tell you that I have copies of my grievances at home but I've moved about four times so some of
my stuff is boxed up and some of my stuff is boxed up and put in storage. So I will go through
that and attempt to locate those." *Id.* at 6. He further explained:

> I would have to go to, like, my wife's house and look at her garage and get my stuff
> out, and then start going through the boxes that I had to box up because I know I
> kept all that stuff. I kept everything that I think I needed to give to my lawyer, and
> that would be something that I would think I would need to give to my lawyer.

*Id.* at 7. After the deposition, Indiana Steel "contacted Plaintiff's counsel by email and requested
that Plaintiff supplement his production of documents with the items he referred to in his
deposition, correct any incorrect or incomplete information in his interrogatory responses, and

certify which responses (if any) were already accurate and complete." Dkt. No. 75 at 4.

Ultimately the Plaintiff responded that he had nothing more to produce. Indiana Steel

characterizes these events as follows: "[Plaintiff's] deposition testimony explicitly references

multiple documents relevant to his claims, and responsive to ISF's discovery requests, that he has

apparently failed to produce to his attorney or ISF." *Id.* at 7. In fact, however, the Plaintiff has

represented that he does not have any such documents. He did not produce any of the missing

written grievances in response to the Defendants' motions for summary judgment, and, were he

to locate such documents and seek to use them at trial, his burden of demonstrating that the Court

should permit him to do so would be very high. Thus, at this point, the issue is not whether the

Plaintiff's case should be dismissed for failure to produce the grievances, but whether his case

should be dismissed because his deposition testimony suggests that his search for responsive

documents prior to his deposition might not have been as thorough as it should have been. Given

that there does not appear to be any willfulness on the part of the Plaintiff, and given the lack of

any prejudice to the Defendants, the Court finds that dismissal on that basis is not appropriate.

     With regard to the notes the Plaintiff testified that he took to aid him in discussion with

his legal (or potential) legal counsel, Indiana Steel does not identify the discovery request to

which they were responsive. In any event, the Plaintiff's testimony makes it clear that the notes

were prepared "in anticipation of litigation or for trial," and Indiana Steel does not argue that

they are nonetheless discoverable. *See* Federal Rule of Civil Procedure 26(b)(3) (describing

showing that must be made before documents prepared in anticipation of litigation or for trial are

discoverable). Indiana Steel's argument, then, is that this case should be dismissed because the

Plaintiff did not realize that the notes he took to aid him in discussing his case with his legal

counsel were responsive to a discovery request and should have been listed on a privilege log.

Again, any such failure was not prejudicial to the Defendants (who, again, now know about the notes and do not argue that they are discoverable), and does not warrant the sanction of dismissal.

Nor do the two documents at issue in Indiana Steel's supplement to its motion for sanctions warrant dismissal. That filing is based on the fact that the Plaintiff submitted a note from his physician and a few of his pay stubs from Indiana Steel in response to the Defendants' motions for summary judgment that he had not produced during discovery. As discussed below, none of those documents were considered by the Court in ruling on the summary judgment motions; therefore, the Defendants were not prejudiced by the Plaintiff's attempt to use them.

The Court appreciates the Defendants' perspective that the discovery process in this case has been more onerous than it should have been. It appears that the litigation of this case has been complicated by the Plaintiff's apparently less than ideal working relationship with his first attorney, by the fact that the Plaintiff is difficult to reach by telephone, and by the fact that the Plaintiff may not have always fully understood his obligations. The Federal Rules of Civil Procedure provide mechanisms for ameliorating any prejudice and/or expense that results from a party's failure to comply with his discovery (or other) obligations and, of course, there are times when dismissal of an action for such failures is an appropriate remedy. That is a drastic remedy, however, and one that the Court believes should be reserved for instances in which the failure to cooperate appears to be an attempt to gain some advantage in the case or to intentionally increase the burden on the opposing parties, or in which the just resolution of the case has been entirely thwarted. *See, e.g.*, *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 561 (7th Cir. 2011) (discussing factors to be considered before imposing "extraordinarily harsh sanction" of dismissal for want of prosecution); *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009) (noting

that "to dismiss a case as a sanction for discovery abuse the court must only find that the party's actions displayed willfulness, bad faith, or fault," and "the sanction imposed must be proportionate to the circumstances").  Viewing the circumstances of this case as a whole, the Court does not believe that dismissal is an appropriate sanction.  Accordingly, the Defendants' motions for sanctions are **DENIED**.[1]

## II.  <u>MOTIONS FOR SUMMARY JUDGMENT</u>

### A.  Applicable Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

---

[1]As noted, this ruling does not preclude the imposition of other sanctions by the Magistrate Judge, who has issued an order to show cause relating to the Plaintiff's failure to appear on time for the settlement conference.

## B. Background Facts

The background facts of record, viewed in the light most favorable to the non-moving party, Plaintiff Carlton L. Rasor, are as follows. Additional facts of record are included, where relevant, in the Discussion section below.

### 1. Facts Relating to Rasor's Job Classification

Rasor began working at Indiana Steel in February 2013. At that time he was a temporary employee; his employer was a staffing company called Forge Staffing.

The hourly employees at Indiana Steel were represented for purposes of collective bargaining by the Union.[2] The relevant collective bargaining agreements ("CBA")[3] between Indiana Steel and the Union contained four job classifications with corresponding wage rates: (1) general labor;[4] (2) machine operator; (3) truck driver; and (4) layout, which includes welders. The general labor job classification was the entry-level, lowest skilled position in the shop; the machine operator and layout classifications were the higher skilled positions in the shop; and the truck driver classification was not an in-shop position. The CBAs further required Indiana Steel to abide by "all State and Federal laws concerning discrimination against any employee for Union activity, race, creed, religion, sex or age." Dkt. No. 81-1 at 38; *id.* at 71 (adding local laws and "disability or other characteristic protected by law").

---

[2]When Rasor first began his employment with Indiana Steel, Teamsters Local 716 represented Indiana Steel employees. Effective March 1, 2015, Local 716 merged into Teamsters Local 135. Because the distinction between the two locals is not relevant to the Court's decision, the Court will simply refer to the Union.

[3]There was one CBA in effect when Rasor began working at Indiana Steel and another that took effect in December 2014.

[4]The 2014 CBA noted that the general labor classification included "Paint + Rebar" and that the layout classification included welders. Dkt. No. 81-1 at 74. The 2011 CBA did not include that information. Neither CBA includes any additional description of the classifications.

In late 2012, four members of the management team at Indiana Steel—Mike Jordan, James Bennett, Tim Nelson, and Ben Strange—purchased the company from the family that had founded it in 1959.

On March 19, 2013, while Rasor was employed by Forge Staffing and working at Indiana Steel, Rasor signed an application for membership in the Union and a dues check-off authorization form. The membership application and dues check-off form were completed by someone at Indiana Steel and presented to Rasor for his signature by Indiana Steel co-owner Ben Strange. The membership application listed Rasor's occupation as "machine operator." Dkt. No. 78-3 at 4. The Union did not receive this form until June 2013.

Rasor became an employee of Indiana Steel on April 3, 2013. According to a written "Hire-On Agreement," Rasor was hired by Indiana Steel as "a full-time employee at a job classification of general labor" at the general labor rate of pay. Dkt. No. 78-3 at 1. However, Rasor believed that he was a machine operator after he was hired, despite what his Hire-On Agreement said, because of the reference to machine operator on the Union membership application that Indiana Steel completed and gave him to sign and because Ben Strange, the Indiana Steel employee who signed his Hire-On Agreement, told him he was being hired as a machine operator and would be replacing an employee named John, who was a machine operator.

When Rasor was hired, he was told he would "be responsible for bringing in the steel, inspecting the steel, using the overhead crane to take the steel off the truck, place it on the dock or either place it into the [storage yard], separate the steel according to my order sheet, organize it on the saw table, which in turn is this automated saw table which brings the steel over and it pushes it in through a big saw and it cuts it down per order and drills holes." Rasor Dep. at 49,

Dkt. No. 78-1 at 8. The saw was operated by an employee named Andy White, who for "about two or three weeks" began training Rasor to run the saw when Rasor had time. *Id.* at 9. A "couple of times" Rasor operated the automated saw and was paid more than his usual rate of pay for that work. *Id.* at 9-10.[5]

Rasor's daily job duties included unloading trucks, marking and organizing materials for quality control, loading steel onto conveyers, feeding material to the saw operator, dumping scrap, and cleaning his general work area, which was the warehouse yard, the stockyard, the loading dock, and the area around the saw. He occasionally moved finished materials. Every few days he would operate a smaller saw or use a splitter to finish cutting an angle iron. Initially occasionally, and then later daily, he prepared material for painting, painted material, loaded material, and logged in the painted and finished material. *Id.* at 13.

### 2. Facts Relating to Rasor's Grievances

Under the collective bargaining agreement between the Union and Indiana Steel, grievances may be filed by an individual employee, the Steward, or the Union by completing a grievance form. The records of both the Union and Indiana Steel contain only one grievance filed by Rasor; it was a December 2013 grievance objecting to a written/verbal warning that Rasor received that related to a beam being cut incorrectly. That grievance does not mention Rasor's pay or job classification, nor does it mention racial discrimination or harassment. Rasor identified his job classification on the grievance as "shipping and receiving clerk."

Rasor filed the following additional grievances during his employment with Indiana Steel:

---

[5]Indiana Steel argues that the Court should disregard the pay stubs submitted by Rasor to support this testimony because he did not disclose them in discovery. In light of Rasor's testimony, the Court need not, and has not, considered the pay stubs.

- a grievance complaining that Rasor was improperly classified as a general laborer instead of as a machine operator in March or April 2013;

- a grievance filed in October 2013 alleging that his co-worker, Andy White, had subjected Rasor, who is black, to racial slurs;

- a grievance filed in November 2013 alleging that co-workers Andy White, Tim McDonough, Mike Leeds, and Kenny Brown subjected Rasor to racial slurs;

- a grievance filed in January 2014 alleging that company co-owner Tim Nelson had cussed at Rasor and had his hands in Rasor's face;

- a grievance filed in February 2014, again alleging that supervisor Sean Lambert was constantly picking on him;

- a grievance filed in March 2014 alleging that supervisor Sean Lambert had called Rasor a "fucking punk";

- a grievance filed in December 2014, again alleging that supervisor Sean Lambert was "constantly picking on [Rasor]" and calling him a troublemaker;

- a grievance filed on an unknown date alleging that co-worker Kenny Brown had used a racial slur and played music full of racial slurs; and

- a grievance filed shortly before Rasor was terminated alleging that he was being subjected to a hostile work environment.[6]

---

[6]Rasor is not certain exactly what he included in this grievance; he filed it in order to give his incoming union representative an idea of what had been happening. He believes that he may have included the fact that the music containing racial slurs was still being played, an incident in which he believed that Andy White had put metal shavings in his lunch, an incident in which Tim Nelson angrily confronted him, and an incident in which Kenny Brown threatened to fight him in the locker room.

Rasor lodged the first two of these grievances with Ryan Proctor, and, with the possible exception of the last one, the remainder with Randall Murphy, who replaced Proctor as union steward. Neither the Union nor Indiana Steel has a record of any of these additional grievances, and Rasor does not have a copy of any of them.

Both CBAs contained a grievance procedure pursuant to which a bargaining unit employee could file a grievance over any issue that related to matters covered by the CBA.

The Union's by-laws contain a process whereby a member who feels he or she is being mistreated by a fellow member or members, including for racial harassment, can file internal union charges against that member or members. Rasor did not file any internal union charges against fellow members at Indiana Steel for racial harassment.

Rasor filed EEOC charges against the Union and Indiana Steel on October 20, 2014. The charges against both parties are identical and state:

> I am a black individual who began working for Indiana Steel Fabricating on February 10, 2013 as a Machine Operator.
>
> I engaged in protected activity when I applied for union membership and requested a pay raise to $19 an hour as every white machine operator had earned. Additional positions were available and I requested transfer to the higher paying positions. Union Steward Randall Murphy (white) informed me that my job classification was changed to general laborer.[7] Throughout my employment, I have been called a "Nigger" and subject[ed] to other racial harassment such as racist jokes, nicknames, and other derogatory comments about blacks by Tim McDonough (white), Andrew White (white), Kenny Brown (white), and Jake (white). In or around July 2013, I expressed my opinion about the Treyvon Martin murder trial. The next day, Aaron Reuther (white) cursed at me and threatened me. I have reported this and other harassment to Owner/Production Manager Tim Nelson (white), Owner/Human Resources Manager Ben Strange (white), Owner Michael Jordan (white), and Owner James (white). Following my protected complaints, Tim Nelson issued several disciplinary actions for infractions other employees were not disciplined for. I contacted Randall Murphy to file a union grievance with Teamsters 716. The

---

[7]During his deposition, Rasor clarified that it was Ben Strange, not Union Steward Randall Murphy, who told him that his job classification was changed to General Laborer.

union did not file or investigate my wage/promotion grievances, racial harassment complaints, or disciplinary grievances.

I believe I was harassed, disciplined, denied promotion, and paid less based on my race (black) and in retaliation for engaging in protected activity in violation of my rights under Title VII of the Civil Rights Act of 1964, as amended.

Dkt. No. 89-1 at 88. The Union did not receive notice of Rasor's EEOC charge until July 2015, after Rasor's termination from Indiana Steel on May 20, 2015. Indiana Steel also was unaware of Rasor's EEOC charge until after he was terminated.

### 3. Rasor's Complaints to Indiana Steel about Hostile Work Environment

Rasor complained to Ben Strange, the Indiana Steel owner whose responsibilities included human resources, five to seven times about Andy White using the word "n----r." Rasor believes that after he complained, White began putting metal shavings in his shoes. When he confronted White about it, White denied doing it and said that "it probably bounced off the floor and was an accident." Dkt. No. 81-2 at 60. On one occasion, Rasor believes that White put metal shavings in his lunch. When he reported that to Tim Nelson, Nelson told him not to eat lunch in that area. When Nelson questioned White about it, White denied it. Rasor moved his desk out on the dock, where it was not protected from the elements. To avoid White, Rasor also complained multiple times to Ben Strange and/or Tim Nelson about the use of racial epithets and racially charged language and the telling of racist jokes by coworkers Kenny Brown, Mike Leeds, Kyle Phillips, and Tim McDonough, as well as one incident involving Sean Landrum and one incident regarding Aaron Reuther. Rasor believed that the incident involving Landrum was addressed promptly by Indiana Steel.[8]

---

[8]Indiana Steel states in its brief that "Rasor acknowledges that the incidents involving Reuther and Landrum were addressed promptly and effectively by ISF management," Dkt. No. 80 at 9, but the evidence cited for that proposition only supports it with regard to Landrum.

Rasor also complained to Ben Strange and Tim Nelson about an incident during which Tim McDonough used the term "black motherfucker" during a workplace conversation about the fatal shooting of Trayvon Martin, an African-American high school student, a topic that was in the news at the time.

### 4. Rasor's Termination

During Rasor's employment at Indiana Steel, he was subject to a no-fault attendance policy. Under the policy, employees began with twelve attendance points. One point was added for each thirty consecutive days of perfect attendance as defined by the policy. A defined number of points were lost for certain absences and for "short shifts"—coming in late or leaving early. If an employee obtained a doctor's note dated no later than the second day of an injury or illness and provided it to Indiana Steel immediately upon returning to work, the employee would lose 1.5 points for the first day missed for that injury or illness, .75 point for the second day, and no points for subsequent days. An employee whose point balance fell to six points received a warning; three points resulted in a final warning, and zero points resulted in termination.

On May 6, 2015, Rasor left work early and took a half-day of vacation. Later that evening, he left a voicemail on Indiana Steel's main line reporting that he had injured his shoulder and was at the hospital seeking treatment. On the morning of Friday, May 8, 2015, Strange received a voicemail from someone claiming to be Rasor stating that he had hurt his shoulder and would be in with a doctor's note on Monday. Shortly thereafter, Strange received a call from a person claiming to be Rasor's brother, who said that Rasor had hurt his shoulder in a vehicle accident and was attempting to get it re-set. A few minutes later, Strange received yet another call from someone claiming to be Rasor, who said that he had hurt his shoulder and would not be coming in to work. Strange asked the caller how he had injured his shoulder, and

the caller said he had suffered the injury lifting a box into a car.  That call came from the number that Indiana Steel had listed as Rasor's emergency contact number.  A few minutes later, Strange received a fourth call from someone saying that he was Rasor, who stated that he wouldn't be coming in to work that day.  Later that day, Strange called Rasor's emergency contact number and asked for Rasor.  The person who answered said that he was Rasor.  Strange asked why multiple people had called him to report Rasor's injury.  The person said "My family cares about me, I guess."  As a result of these calls and the conflicting statements made by the various callers, Strange was suspicious about the reasons for and circumstances surrounding Rasor's absence.

Indiana Steel did not hear from Rasor or anyone on Rasor's behalf again until May 18, 2015, when Rasor called and spoke to Strange.  Rasor stated that he had injured his shoulder while working on a mini-bike on May 6th and that he had been arrested that same day and had just been released from jail.  Rasor explained that he had been unable to call while he was incarcerated and that his family members had been unable to call because they had been away at a funeral.  On May 19, 2015, Rasor came in to Indiana Steel.  Strange told him if he planned to provide Indiana Steel with a doctor's note and/or release regarding his shoulder injury, he needed to do so immediately.  Rasor stated he would try to see his doctor that day.  He reported to Strange that his shoulder felt fine at that point.

As of May 6, 2015, Rasor had 2.5 attendance points.  His absence on May 7th (while he was incarcerated) lowered his point total to 1 point; his absence on May 8th lowered it to -0.5 points.  Rasor missed an additional six shifts while he was incarcerated.

On May 20, 2015, Strange mailed Rasor a letter notifying him that he had been terminated as of that date pursuant to the attendance policy. Rasor did not file a grievance relating to his discharge. Rasor did not see his doctor regarding his shoulder until May 21, 2015.

## C. Discussion

Each Defendant's motion for summary judgment will be discussed, in turn, below.

### 1. Indiana Steel's Motion for Partial Summary Judgment[9]

Rasor asserts that Indiana Steel discriminated against him on the basis of his race by classifying his job as a general labor position rather than the higher paying machine operator position and retaliated against him for filing grievances and for filing an EEOC charge.[10] Each of these claims is addressed, in turn, below.

#### a. Race Discrimination—Classification as General Laborer

Rasor alleges that he was paid at the lower, general laborer rate for performing the same job for which white employees were paid at the higher, machine operator rate. Indiana Steel does not dispute that that is true, but rather argues that the difference was not the race of the employees involved, but rather the fact that the company changed hands and the new owners decided not to apply the previous owners' policy of paying general laborers at the higher rate when they hired new employees.

Although Rasor does not set forth the legal basis for his claims in his brief in response to the instant motions for summary judgment, in his Complaint he references both Title VII, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981(b). Under both statutes, in determining whether Rasor's

---

[9]The Court appreciates Indiana Steel's decision to forgo moving for summary judgment on the Plaintiff's hostile work environment claim. Far too many Defendants feel compelled to move for summary judgment on all claims, even when a material factual dispute is apparent.

[10]As noted above, Rasor also asserts a hostile work environment claim, but Indiana Steel does not seek summary judgment on that claim.

claim that he was classified as a general laborer because of his race survives summary judgment, the relevant inquiry is whether the evidence as a whole would permit a reasonable factfinder to conclude that Rasor's race caused Indiana Steel to classify him as a general laborer and pay him accordingly. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir.) (2016) (noting that analytical framework for section 1981 and Title VII is "essentially identical"). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

Here the relevant evidence, viewed in the light most favorable to Rasor, is that Rasor was told by Strange and Nelson, two of the owners of Indiana Steel, that he was replacing another employee, John, who was a machine operator and that he would also be a machine operator. Consistent with that conversation, Strange gave him an application for membership in the Union that listed his job as machine operator. In addition, Strange told Rasor that the painter position was a machine operator position, but another black employee, Shane, was hired as a painter and classified as a general laborer.[11] While Indiana Steel asserts that Rasor was classified as a general laborer because the new owners of the company made the decision to properly classify all new employees prior to Rasor's employment at Indiana Steel, the only evidence Indiana Steel offers in support of that assertion is the following paragraph in Strange's affidavit:

> Prior to [Indiana Steel's] current ownership group purchasing ISF in late 2012, the previous owners had paid bargaining unit employees performing general labor duties at the higher machine operator rate, regardless of whether they performed machine operator or general labor duties. In early 2013, prior to Rasor working at ISF, the new owners made the decision to begin utilizing the general labor job

_____

[11]Rasor also testified about a third black employee, Harry Bell, whom he believes was treated similarly, but the source of Rasor's knowledge about Bell's situation is not clear.

classification in the collective bargaining agreement, and pay new general labor employees at the correct general labor rate. Employees performing general labor duties who were hired prior to 2013 and were already being paid the machine operator rate, continued to receive the higher rate, while incoming employees performing general labor duties would receive the general labor rate.

Dkt. No. 81-1 at 3 ¶ 8. However, Indiana Steel points to no evidence of record that shows that the job performed by Rasor was properly classified as general laborer.[12]

Given the evidence of record at this time, the Court cannot say as a matter of law that no reasonable jury—again, viewing the evidence in the light most favorable to Rasor—could find that Rasor's classification as a general laborer rather than a machine operator was due to his race. Accordingly, Indiana Steel's motion for summary judgment is **DENIED** with regard to Rasor's claim that he was classified as a general laborer rather than a machine operator because of his race.

### b. Race Discrimination—Failure to Promote and Train

Rasor also alleges that Indiana Steel failed to promote him because of his race. Rasor points to two positions that he sought[13] and did not receive—the painter's position that was given

---

[12]The parties have set forth descriptions of Rasor's job duties, each party seemingly believing that its description supports its position regarding whether Rasor was properly classified as a general laborer. However, the CBA does not contain job descriptions for the various job classifications, the parties do not point to any other written job description, and the title "machine operator" is not such that it is inherently obvious whether a person who performs a certain set of tasks should be classified as a machine operator rather than a general laborer. Therefore, the record before the Court is not such that a reasonable factfinder could draw any conclusion simply from the descriptions of Rasor's job duties. Further, while Indiana Steel cites Strange's affidavit for the proposition that Rasor "performed duties such as loading and unloading trucks, loading conveyers, marking and organizing materials, and dumping scrap, which are all general laborer duties," Dkt. No. 96 at 8 (citing Strange Aff. At ¶ 14), the affidavit does not actually support the assertion that those were "all general laborer duties," but rather that those were duties that Rasor performed as a general laborer. That statement begs the question, as *any* duty performed by Rasor was performed "as a general laborer," given that that was his job classification.

[13]As Indiana Steel correctly points out, Rasor did not formally bid for either position; however, Rasor testified that no bid sheets were available and that he inquired about the

to a new employee named Shane, and a rebar position that was given to a new employee named Harry Bell. However, both Shane and Bell, like Rasor, are black; accordingly, Rasor's race could not have been the reason he did not receive those positions. In addition, "[f]ailure to promote claims are only actionable if not receiving the position is a materially adverse employment action. Generally, this means that the position for which the plaintiff was rejected offered markedly greater compensation, responsibilities, or title." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892-93 (7th Cir. 2016) (citations omitted). However, Rasor testified that both Shane and Bell were hired as general laborers, and there is no evidence that either position would actually have been a promotion for Rasor. Accordingly, Indiana Steel is entitled to summary judgment on Rasor's failure to promote claim.

      With regard to his denial of training claim, Rasor argues the following in his brief:

> Rasor also expressed an interest in getting trained to be a welder after he took a test at Workforce One, and was offered an opportunity to be trained as a welder but [Indiana Steel] would not allow him to do so. (Rasor Dep., Vol I, p. 88). However, [Indiana Steel] had allowed or sent other white employees to welding school to be trained as welders. (Rasor Dep., p. 88, 14). Rasor testified that he asked ISF (Ben Strange and Tim Nelson) to allow him to go to welding school about ten times and [Indiana Steel] told Rasor that he was on his own and if he got trained as a welder there were no positions at [Indiana Steel]—although Ryan Proctor had died and was a welder or layout employee. (Rasor Dep. P. 89-90). Rasor testified that a temporary employee came in and filled the welding position while he was there. (Rasor Dep., p. 89). Rasor expressed interest in a painting position since it was a machine operator position but Ben Strange told Rasor that ISF sent Andy White (white) and Kyle Phillips (white) to welding school and Rasor was told Andy would be leaving work early although [Indiana Steel] would not let Rasor leave early to attend welding school. Rasor testified that Andy White and Kyle Phillips were both "topped out" at the highest pay and that they did not benefit from going to welding school as Rasor would have if he had been allowed to be trained as a welder. (Rasor Dep., Vol. 1, p. 91).

---

positions. The Court will assume, without deciding, that Rasor's actions were sufficient to be considered applying for the positions.

Dkt. No. 88 at 8-9.  The deposition testimony cited in support of this claim falls far short of providing evidence from which a reasonable jury could find that Rasor was denied training on the basis of his race.  First, Rasor did not testify that Indiana Steel would not allow him to leave early to attend welding school; his testimony was as follows:

> I told him, I said, but sometimes this welding school is during the time that I would be at work.  You know, like there would be a couple of days I have to get off work early. So the dude told me that, you know, that would be up on your own, if that's what you wanted to do, but there wouldn't be no positions for you here as a welder.

Dkt. No. 89-1 at 23.  Second, Rasor conceded at his deposition that he did not know whether Indiana Steel had, in fact, paid for White and Phillips to attend welding school.  *See* Dkt. No. 81-2 at 23 ("I don't know who ultimately paid for it, because they could have had to reimburse the Company back.  But from my understanding, the Company was paying for them to go to welding school so they could be accessible if ever needed.").  In any event, Indiana Steel has submitted evidence (which is consistent with Rasor's testimony) that the "welding school" in question was a one-day course on welding basics, not the type of training Rasor was seeking that would qualify him for a welder job.  Accordingly, Indiana Steel is entitled to summary judgment on this claim as well.

### c. Race Discrimination—Termination

Rasor's claim with regard to his termination is two-fold.  First he asserts that the no-fault attendance policy was applied improperly to him.  Rasor notes that he injured his shoulder on May 6, 2015, and was not released by his physician to return to work until May 30, 2015; therefore, he argues, he never fell below zero points under the policy because he should only have been charged 2.25 points for May 7th and 8th and no other points for the remainder of time he missed starting on May 6th.  However, the policy explicitly provides that a doctor's statement "dated no later than the second day" is required in order for an absence to qualify for the rule

cited by Rasor, and the evidence is undisputed that Rasor did not obtain a doctor's statement within that time.[14]   Therefore, Rasor's termination was supported by the application of the plain language of the no-fault attendance policy.

Rasor's second argument is that Indiana Steel did not apply the no-fault attendance policy strictly with regard to its white employees:

> Andy White, one of the white workers who Rasor charges with making racist comments and creating a racially hostile work environment, would come to work late and it was a joke around the shop that after he had two points he would come in late maybe ten times.  Rasor kept track of Andy White's attendance because Andy was a machine operator who should have been terminated and his job would have been one that Rasor could try to fill.  (Rasor Dep., Vol I, p. 153). Rasor also had knowledge that Kyle Phillips falsely clocked in Andy White but neither white employee was disciplined for this conduct.  (Rasor Dep., Vol I, p. 153-154).  Rasor also recalled when Ryan Proctor, a white employee, who had .5 points left and came to work so drunk that he threw up in a wastebasket and walked off the job and the company called his mother to get him back to work because he was out of points.  (Rasor Dep. Vol I, p. 154).  Rasor knew how many points the white employees had because Ben Strange would come around the plant with a sheet showing the points for each employee and would also discuss the points with each employee in a manner which would permit other employees to hear the conversation and Ryan was physically close to Rasor and Rasor heard the conversation. (Rasor Dep. Vol I, p. 156).  Rasor overheard Ben Strange telling Andy White that he was at zero points and not to miss a day or be late but Andy would be late 5 or 10 or 15 minutes and he would not be terminated.  (Rasor Dep., Vol I, p. 156).  Also an older white man, Ernie, went past his points and was never terminated.  (Rasor Dep. Vol I, p. 156, l. 22-24).

Dkt. No. 88 at 11-12.  The Court agrees with Indiana Steel that Rasor's testimony regarding other employees' attendance issues is not based on personal knowledge and therefore is simply speculation.  Further, Rasor has not provided sufficient information to demonstrate that any of these employees were similarly situated to Rasor; indeed, there is no indication that any of them

---

[14]Rasor has submitted a note from a doctor dated May 29, 2015.  Indiana Steel objects to the use of this doctor's statement as evidence because Rasor did not produce it during discovery. Rasor's claim fails regardless of whether the doctor's statement is considered.

missed more than a week of work due to being incarcerated like Rasor did. Accordingly, Indiana Steel is entitled to summary judgment on this claim.

### d. Retaliation

Finally, Rasor asserts a claim for retaliation for complaining about race discrimination. "To survive summary judgment on a timely retaliation claim, plaintiff must offer evidence of: (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (citations omitted).

Rasor alleges that he was terminated[15] in retaliation for his numerous complaints and grievances and for the EEOC complaint that he filed on October 20, 2014. However, Rasor points to no evidence to support this argument other than the fact that he made complaints[16] and he was terminated.[17] This is not sufficient to defeat summary judgment. Indeed, Rasor's bare bones argument is similar to that found lacking in *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017):

> [King] offers no suspicious timing, no comparator evidence, and . . . no comments by decisionmakers in reference to any of King's or anyone else's protected activities that could suggest a retaliatory animus. Thus, even if King could show that the 5-Day Quit process was a pretext, there is no evidence from which a jury

---

[15]Rasor also argues that written discipline he received on August 13, 2013, was retaliatory. However, even assuming that the warning constituted an adverse employment action, Rasor points to no protected activity that he engaged in prior to that warning. Rather, the only complaint he identifies that was made prior to that date involved his classification as a general laborer, and there is no evidence that this complaint mentioned race discrimination.

[16]Some, although not all, of Rasor's grievances raised race discrimination or harassment and therefore appear to be protected activity. The Court notes that Indiana Steel does not argue that Rasor has no evidence that it was aware of these grievances, although Rasor's own argument indicates that he does not believe it was. *See* Dkt. No. 88 at 20 ("It is reasonable to infer that the stewards did not pass them along to Cahill and simply tossed them in the wastebasket and that no one got back to Rasor.").

[17]Rasor also reiterates his argument that his termination was not consistent with the no-fault attendance policy, which is addressed, and rejected, above.

could find that it was a pretext *for retaliation* for King's taking of FMLA leave or complaints of sexual harassment a year earlier. That missing link is fatal to King's claims.

In addition, the Court notes that the record is undisputed that Indiana Steel was unaware of Rasor's EEOC complaint at the time of Rasor's termination; accordingly, it could not have been a reason for the termination. Accordingly, Indiana Steel is entitled to summary judgment on Rasor's retaliation claim.

## 2. The Union's Motion for Summary Judgment

In his Complaint, Rasor alleges that the Union

> unlawfully discriminated and breached their contract with the Plaintiff in that the union representative failed to enforce the contract it had with Indiana Steel and ensure that Plaintiff was being paid his fair wages according [to] the union contract in place, [and] failed to prosecute his grievances based upon the hostile and discriminatory work environment reported to them.

Dkt. No. 1 at 2.[18]  In his brief, Rasor explains his claim against the Union as follows:

> Rather, it is Rasor's contention that the Union discriminated against him and other African-American members of the Union at [Indiana Steel] by breaching their contractual obligations created by the CBA to represent Rasor and other minority members with regard to a number of matters. Rasor contends that the evidence demonstrates that he and the other black employees were ignored and not appropriately represented by the Union when it was obligated to represent him and all members of the Union. In fact, an inference can be drawn by the trier of fact that the Union acted in concert with or in support of the positions of [Indiana Steel] when it was obligated to represent the workers and not [Indiana Steel].

---

[18]Rasor also states in the conclusion of his brief that "[t]his evidence also demonstrates that both the Union and [Indiana Steel] retaliated against Rasor and the other black workers after they grieved these issues and Rasor ultimately filed EEOC charges against them." Dkt. No. 88 at 22. However, Rasor wholly fails to articulate any basis for his retaliation claim against the Union or respond to the Union's arguments regarding that claim. "It is not this court's responsibility to research and construct the parties' arguments," *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011), and the Court will not do so here.

Dkt. No. 88 at 17. Rasor has evidence (his own testimony) that he submitted numerous grievances to his union stewards and that those grievances were not acted upon by the Union.[19] Rasor points to no evidence—direct or circumstantial—from which a jury could conclude that the failure to act was due to Rasor's race. For example, Rasor points to no evidence of racial animus on the part of the Union or evidence that the Union treated any similarly situated white employee better than it treated him vis-à-vis the handling of grievances. And while a race discrimination claim against a union may be based upon evidence that the union had "decided as a matter of policy not to grieve complaints of discrimination by black members of the bargaining unit because the company [was] hostile to such complaints and the union fear[ed] that this hostility [would] make it harder for the union to succeed in its dealings with the company," *E.E.O.C. v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 661 (7th Cir. 2003) (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987)), Rasor points to no evidence that the Union had any such policy. Nor is there any evidence that would support a finding that the Union was motivated by race in its negotiations over the 2014 CBA.[20] This lack of evidence is fatal to each of Rasor's race discrimination claims against the Union.

---

[19]The Court need not address the Union's argument that Rasor's testimony is insufficient to establish that he filed the grievances in question because it is too implausible to be believed, *see, e.g, Melton v. Tippecanoe County*, 838 F.3d 814, 819 (7th Cir. 2016), because even assuming that the grievances were filed, Rasor points to no evidence that the reason they were not pursued by the Union was because Rasor is black.

[20]In his brief, Rasor asserts, without any further elaboration or citation, that "[t]he record presents additional evidence of racial discrimination by the Union when it renegotiated the CBA in 2014 to provide that paint and rebar work would be reclassified as General Labor work. (Rasor Deposition Exhibit 11). This had the effect of removing these machine operator positions which were being performed by African-American employees such as Rasor, Shane and Harry Bell from any opportunity to be considered to be machine operators and left the white employees who were also doing machine operator work in a higher classification and pay rate." Dkt. No. 88 at 20.

Finally, Rasor argues that the Union's failure to pursue his grievances in which he alleged that he was being subjected to a hostile work environment "was a breach of the Union's responsibility to represent all the members of the local." Dkt. No. 88 at 20. As the Union points out in its reply, however, neither Rasor's Complaint nor his Statement of Claims asserts such a claim, and, in any event, Rasor has failed to adequately articulate such a claim. Accordingly, the Union's motion for summary judgment is **GRANTED** in its entirety.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Union's motion for summary judgment (Dkt. No. 76) is **GRANTED**. Defendant Indiana Steel's motion for partial summary judgment (Dkt. No. 79) is **GRANTED IN PART AND DENIED IN PART**. The Defendants' motions for sanctions (Dkt. Nos. 72 and 74) are **DENIED**. Indiana Steel's Motion for Leave to File Supplemental Reply in Support of its Second Motion to Dismiss (Dkt. No. 92) is **GRANTED**, and **the Clerk is directed to file the supplemental reply, found at Docket Number 92-1, as of the date of this Entry**. The Clerk may simply note on the relevant docket entry that the exhibits relating to that motion can be found in Docket Number 92.

The following claims remain for trial: (1) Rasor's claim for hostile work environment against Indiana Steel; and (2) Rasor's claim for race discrimination against Indiana Steel based upon his classification as a general laborer rather than a machine operator. No claims remain against the Union.

On the Court's own motion, the final pretrial in this case is **RESET** to September 18, 2018, at 10:00 a.m., in Room 202 of the United States Courthouse, Indianapolis, Indiana, and the jury trial is **RESET** to October 24, 2018, at 9:00 a.m. in Room 131 of the United States Courthouse, Terre Haute, Indiana, The parties are reminded of their pretrial preparation

deadlines, which are found in section VIII of the case management plan in this case.  *See* Dkt.

No. 22 at 6-8.

      SO ORDERED: 7/31/18

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification